# General Civil Case Filing Information Form (Non-Domestic)

**Court**
☒ **Superior**
☐ **State**

**County** _Fulton_

**Docket #** _2011CV209820_

**Date Filed** _12-30-2011_
MM-DD-YYYY

**Plaintiff(s)** _Sibley, Patricia_

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|------------------------|--------|

_Kendmer, Edward_

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|------------------------|--------|

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|------------------------|--------|

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|------------------------|--------|

**No. of Plaintiffs** _2_

**Defendant(s)** _National City Mortgage Co_

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|------------------------|--------|

_Natl. City Bank_

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|------------------------|--------|

_PNC Bank_

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|------------------------|--------|

_Bank of America_

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|------------------------|--------|

_Unidentified Creditors etc_

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|------------------------|--------|

**No. of Defendants** _4_

**Plaintiff/Petitioner's Attorney**   ☐ **Pro Se**

_Thompson Robert JR_

| Last | First | Middle I. | Suffix |
|------|-------|-----------|--------|

**Bar #** _709750_

**FILED IN OFFICE**
DEC 3 0 2011
_K. Minch_
DEPUTY CLERK SUPERIOR CO
FULTON COUNTY, GA

---

**Check Primary Type** (Check only **ONE**)

☐ Contract/Account

☐ Wills/Estate

☐ Real Property

☐ Dispossessory/Distress

☐ Personal Property

☒ Equity

☐ Habeas Corpus

☐ Appeals, Reviews

☐ Post Judgment Garnishment, Attachment, or Other Relief

☐ Non-Domestic Contempt

☐ Tort (If tort, fill in right column)

☐ Other General Civil Specify _____

---

**If Tort is Case Type:**
(Check no more than **TWO**)

☐ Auto Accident

☐ Premises Liability

☐ Medical Malpractice

☐ Other Professional Negligence

☐ Product Liability

☐ Other Specify _____

_____

**Are Punitive Damages Pleaded?** ☐ Yes ☐ No



# THE SUPERIOR COURT FOR THE COUNTY OF FULTON
## STATE OF GEORGIA

| | |
|---|---|
| PATRICIA SIBLEY & EDWARD KENIMER, JR.,    ) | |
| ) | FILED IN OFFICE |
| Plaintiffs,     ) | DEC 3 0 2011 |
| ) | DEPUTY CLERK SUPERIOR COURT FULTON COUNTY, GA |
| v.     ) | Civil Action File No. 2011CV209 |
| ) | |
| NATIONAL CITY MORTGAGE ) | |
| COMPANY; NATIONAL CITY ) | |
| BANK, N.A., PNC MORTGAGE, ) | |
| A DIVISION OF PNC BANK, NA; ) | |
| BANK OF AMERICA, NA; & ) | |
| UNIDENTIFIED INVESTORS, ) | |
| CREDITORS, REAL PARTIES ) | |
| IN INTEREST & AGENTS NOT ) | |
| YET IDENTIFIED ) | |
| ) | |
| Defendants.    ) | |

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that file marked copies of the Plaintiffs'

MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM

IN SUPPORT, LIS PENDENS, RULE NISI, AFFIDAVIT AND EXHIBITS have

been served on the Defendants and their attorneys via First Class Mail at the

following addresses:

McCurdy and Candler, LLC

1

3525 Piedmont Road
Building 6, Suite 700
Atlanta GA 30305

Bank of America, N.A.
c/o CT Corporation System
1201 Peachtree Street NE
Atlanta, Georgia 30361

National City Mortgage Company
3232 Newmark Drive
Miamisburg, Ohio 45342

PNC Mortgage
3232 Newmark Drive
Miamisburg, Ohio 45342

PNC Bank, N.A.
6750 Miller Road
Brecksville, Ohio 44141

Respectfully submitted this 30th Day of December, 2011.

THOMPSON LAW GROUP, LLC

Robert Thompson, Jr., Esq.
Georgia Bar No. 709750
Seth Katz, Esq.
Georgia Bar No. 197411
**Thompson Law Group, LLC**
P.O. Box 53484
Atlanta, Georgia 30355
Telephone: (404) 816-0500
Facsimile: (404) 816-6856
rthompson@thomlaw.net
skatz@thomlaw.net

Office Address:

2

**Thompson Law Group, LLC**
Ivy Place
3423 Piedmont Road
Suite 530
Atlanta, Georgia 30305



## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

PATRICIA SIBLEY & EDWARD KENIMER, JR.,

       Plaintiff,

and                          CIVIL ACTION FILE NO. 2011CV209820

NATIONAL CITY MORTGAGE COMPANY;
NATIONAL CITY BANK, N.A.; PNC MORTGAGE
A DIVISION OF PNC BANK, NA; BANK OF
AMERICA, NA; AND UNIDENTIFIED
INVESTORS, CREDITORS, REAL PARTIES
IN INTEREST AND AGENTS NOT YET IDENTIFIED,

       Defendants.

**FILED IN OFFICE**

DEC 30 2011

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## EX PARTE ORDER ON MOTION TO STAY FORECLOSURE SALE

The plaintiffs have moved for a temporary restraining order staying a foreclosure

planned for January 3rd, 2011, for a residence at 4402 Whitewater Creek Road, Atlanta, GA.

The motion was brought to chambers at 4:45 P.M. on December 30th, 2011. The Court's

staff attempted to reach opposing counsel but was unable to do so.

Having reviewed the evidence presented with the complaint, the Court concludes that

sufficient evidence and good cause exists to grant the following relief:

The defendants shall not proceed with foreclosure with respect to the real property

described herein until further Order of the Court, or until this Order expires by operation of

law, whichever is sooner.

As a precondition of granting the relief set forth in the preceding paragraph, the

plaintiff is required to tender into the registry of the Court, the amount of $ 9,800.00 on or

before February 1st, 2012. Further, the plaintiff is required to tender into the Registry of the

Court the amount of $ 9,800.00 on or before the first day of each month, with the first

payment coming due on March 1st, 2012, until such time as the Court determines o

dismisses his claims.

SO ORDERED, this _30_ day of December, 2011, at _5:10_ P.M.

Presiding Judge Bensonetta Tipton Lane
Superior Court of Fulton County
Atlanta Judicial Circuit

Copies to:

Plaintiffs, in chambers

The plaintiff shall be responsible for serving a copy of this order upon the defendants.



## THE SUPERIOR COURT FOR THE COUNTY OF FULTON
## STATE OF GEORGIA

|  |  |
|---|---|
| PATRICIA SIBLEY & <br> EDWARD KENIMER, JR., | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | ) <br> ) |
| NATIONAL CITY MORTGAGE <br> COMPANY; NATIONAL CITY <br> BANK, N.A., PNC MORTGAGE, <br> A DIVISION OF PNC BANK, NA; <br> BANK OF AMERICA, NA; & <br> UNIDENTIFIED INVESTORS, <br> CREDITORS, REAL PARTIES <br> IN INTEREST & AGENTS NOT <br> YET IDENTIFIED | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) |

FILED IN OFFICE

DEC 30 2011

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

Civil Action File No. 2011CV209

## **VERIFICATION**

Personally appeared before the undersigned officer, duly authorized to administer oaths, Patricia Sibley and Edward Kenimer, Jr., who, upon first being duly sworn on oath, depose and state that to the best of their knowledge, information and belief the facts contained within this VERIFIED APPLICATION AND MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION are correct and true.

This _30th December_, 2011.

_Patricia Sibley_
PATRICIA SIBLEY

_Edward Kenimer Jr._
EDWARD KENIMER, JR.

_Ayrn Michelle Sedore_
Notary Public

THE SUPERIOR COURT FOR THE COUNTY OF FULTON
STATE OF GEORGIA

PATRICIA SIBLEY &            )
EDWARD KENIMER, JR.,         )
                             )
            Plaintiffs,      )
                             )
v.                           )        Civil Action File No. 2011CV209
                             )
NATIONAL CITY MORTGAGE       )
COMPANY; NATIONAL CITY       )
BANK, N.A., PNC MORTGAGE,    )
A DIVISION OF PNC BANK, NA;  )
BANK OF AMERICA, NA; &       )
UNIDENTIFIED INVESTORS,      )
CREDITORS, REAL PARTIES      )
IN INTEREST & AGENTS NOT     )
YET IDENTIFIED               )
                             )
            Defendants.      )

**FILED IN OFFICE**
DEC 30 2011
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

2011-0374178
Catherene Robinson
Clerk of Superior Court
Fulton County, Georgia

## LIS PENDENS NOTICE

TO WHOM IT MAY CONCERN:

THIS LIS PENDENS NOTICE IS TO ADVISE THAT THE ABOVE-
STYLED CASE HAS BEEN FILED IN CONNECTION WITH A DISPUTE
WITH THE ABOVE-NAMED DEFENDANTS CONCERNING THE
FOLLOWING DESCRIBED REAL ESTATE IN CHEROKEE COUNTY,
OTHERWISE KNOWN WITH THE ADDRESS OF 4402 Whitewater Creek
Road NW, Atlanta, Georgia, Fulton County, described as:

"All that tract or parcel of land lying and being in Land Lot 214, 17th
District, Fulton County, Georgia, being Lot 2, Block E, Section Two of
Whitewater Creek Colony, as per plat recorded in Plat Book 87, Page 70,
Fulton County, Georgia Records, which plat is incorporated herein and made
a part hereof by reference, which has the property address of 4402

Whitewater Creek Road NW, Atlanta, Georgia, together with all fixtures and other personal property conveyed by said deed,"

This Lis Pendens Notice has been filed and recorded as provided by law.

This 30th day of December, 2011.

THOMPSON LAW GROUP, LLC

_____

Robert Thompson, Jr., Esq.
Georgia Bar No. 709750
Seth Katz, Esq.
Georgia Bar No. 197411
**Thompson Law Group, LLC**
P.O. Box 53484
Atlanta, Georgia 30355
Telephone: (404) 816-0500
Facsimile: (404) 816-6856
rthompson@thomlaw.net
skatz@thomlaw.net

Office Address:
**Thompson Law Group, LLC**
Ivy Place
3423 Piedmont Road
Suite 530
Atlanta, Georgia  30305



## THE SUPERIOR COURT FOR THE COUNTY OF FULTON
## STATE OF GEORGIA

| | |
|---|---|
| **PATRICIA SIBLEY &** )<br>**EDWARD KENIMER, JR.,** )<br> )<br>**Plaintiffs,** )<br> )<br>**v.** )<br> )<br>**NATIONAL CITY MORTGAGE** )<br>**COMPANY; NATIONAL CITY** )<br>**BANK, N.A., PNC MORTGAGE,** )<br>**A DIVISION OF PNC BANK, NA;** )<br>**BANK OF AMERICA, NA; &** )<br>**UNIDENTIFIED INVESTORS,** )<br>**CREDITORS,  REAL PARTIES** )<br>**IN INTEREST & AGENTS  NOT** )<br>**YET  IDENTIFIED** )<br> )<br>**Defendants.** )<br>——————————————— ) | **FILED IN OFFICE**<br>DEC 3 0 2011<br>DEPUTY CLERK SUPERIOR COURT<br>FULTON COUNTY GA<br><br>**Civil Action File No.** 2011CV209_ |

## MEMORANDUM OF LAW IN SUPPORT OF VERIFIED APPLICATION AND MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERRMANENT INJUNCTION

Comes now Plaintiffs, **PATRICIA SIBLEY AND EDWARD KENIMER,**

**JR.,** (hereinafter referred to as "**Plaintiffs**"), and file this their Memorandum of

Law in Support of their Verified Application and Motion for Temporary

Restraining Order, Preliminary Injunction, and Permanent Injunction, enjoining

**Defendants, NATIONAL CITY MORTGAGE COMPANY, NATIONAL**

1

**CITY BANK, NA, PNC MORTGAGE, a division of PNC BANK, NA, BANK of AMERICA, NA, and UNIDENTIFIED INVESTORS, CREDITORS, & REAL PARTIES IN INTEREST AND THEIR AGENTS NOT YET IDENTIFIED** as the purported loan servicers or purported creditors, in connection with Plaintiffs' mortgage loan number **1134040178**, (Brookhaven Loan Number) or **02503450** (PNC Mortgage Loan Number) from foreclosing and selling Plaintiffs' home and real property located at **4402 Whitewater Creek Road NW, Atlanta, Georgia, Fulton County** (hereinafter the "**Subject Property**") on **Tuesday, January 3, 2012,** and to enjoin all others acting in concert with Defendants including but not limited to agents, real estate personnel or agents, defendants' companies' and subsidiaries' employees, officials or contractors, from pursuing and otherwise further attempting to foreclose and sell Plaintiffs' Subject Property.

The Subject Property was first acquired by Plaintiffs in 1997 and refinanced in 2003. It consists of real property including Plaintiffs' home residence described as **"all that tract or parcel of land lying and being in Land Lot 214, 17th District, Fulton County, Georgia, being Lot 2, Block E, Section Two of Whitewater Creek Colony, as per plat recorded in Plat Book 87, Page 70, Fulton County, Georgia Records, which plat is incorporated herein and made a part hereof by reference, which has the property address of 4402**

2

**Whitewater Creek Road NW, Atlanta, Georgia, together with all fixtures and other personal property conveyed by said deed,"** in the Office of the Clerk of the Superior Court for Fulton County, Georgia, and otherwise known as **4402 Whitewater Creek Road NW, Atlanta, Georgia.**

## PARTIES

**Plaintiffs, Patricia Sibley and Edward Kenimer, Jr.** are married adult individuals and residents of Fulton County who reside with their family at the Subject Property and home whose address is: **4402 Whitewater Creek Road NW, Atlanta, Georgia. (Kenimer Affidavit & Exhibit 1).**

Plaintiffs have a residential mortgage on the subject property which at different times has been serviced by **Defendant National City Mortgage Company** which **was** a subsidiary of **Defendant National City Bank NA.** In 2008 in cooperation with the FDIC, **PNC Bank NA** acquired Defendants National City Bank NA and National City Mortgage Company by a federal government supervised merger resulting in the publically announced dissolution of both National City Bank, N.A. and National City Mortgage Company in 2008. No registered agent for NCMC or National City Bank NA could be found at the Georgia Secretary of State's office **(Kenimer Affidavit & Exhibits 5 and 6).**

Prior to 2008 Defendant National City Mortgage Company (hereinafter "NCMC") was a wholly owned division of National City Bank, NA, and serviced

3

mortgage loans for lenders, investors and others under the NCMC name on behalf of National City Bank, NA. As noted previously NCMC and National City Bank, NA were publically dissolved as corporations in 2008, and were the defunct and dissolved Servicers for the mortgage of the Plaintiffs, and many other individuals and others in considerable numbers conducting business throughout the State of Georgia including Fulton County.

Defendant NCMC is the latest in a line of successive agents of foreclosure, and though dissolved have claimed to be Secured Creditors and Real Parties in Interest, purportedly owning mortgage loans in Georgia and claiming the right and ability to foreclose against and sell the property and home of the Plaintiffs (Subject Property). In fact despite being a dissolved corporation NCMC, NCMC has published a Notice of Sale Under Power on the Subject Property most recently during the month of December, 2011, on December 5, 12, & 19, 2011 in the *Fulton County Daily Report,* alleging it is the Real Party in Interest who owns the mortgage loan on the Subject Property and according to the advertisement plans to foreclose and sell the Subject Property on Tuesday, January 3, 2012. **(Kenimer Affidavit & Exhibit 9).**

**Defendant PNC Mortgage** is a wholly owned subsidiary **of PNC Bank, NA,** and Servicer for other mortgage lenders as well as PNC Bank, NA with banking and lending operations and mortgage servicing operations conducted

4

throughout the State of Georgia including Fulton County. However, neither PNC Bank NA, nor PNC Mortgage have any registered agent on file with the Georgia Secretary of State that can be identified. **(Kenimer Affidavit & Exhibits 6 and 39).**

**Defendant Bank of America, NA,** (hereinafter "**BOA**") is a national bank with major daily operation in the State of Georgia. It handles all aspects of residential mortgage operations including origination, lending, funding, administration and management of individual mortgages, mortgage pools for securitization, and other mortgage-related activities. Bank of America, NA conducts extensive business throughout the state of Georgia, including an extensive branch network that includes the BOA retail and other banking functions including mortgage administration. BOA has extensive operations and conducts business throughout Fulton County. BOA's registered agent is located in Fulton County and may be served at: c/o Registered Agent CT Corporation System/Shakinah Edwards, 1201 Peachtree Street NE, ATLANTA GA 30361.

BOA has published a Notice of Sale Under Power on the Subject Property most recently on December 27, 2011 in the *Fulton County Daily Report*, alleging it is the Real Party in Interest who owns the mortgage loan on the Subject Property and according to the advertisement plans to foreclose and sell the Subject Property on **Tuesday, January 3, 2012. (Kenimer Affidavit & Exhibits 40 and 8).**

5

**Defendants Unidentified Investors, Creditors, and Real Parties in**

**Interest & Their Agents Not Yet Identified** by the Plaintiffs have been

mentioned, discussed and alluded to repeatedly but never identified by agents of

Defendant PNC Mortgage, and will be joined as identified and determined to be

necessary parties to this and related litigation. **(Kenimer Affidavit & Exhibits 33-**

**36).**

## STATEMENT OF FACTS

The facts of this case are contained in the Affidavit and related Exhibits of

Edward Kenimer, Jr. and incorporated here as if set forth in their entirety.

## SUMMARY OF ARGUMENT AND RELIEF SOUGHT

## Legal and Equitable Issues

1. **Fatal Advertising and Notice Errors Committed by Defendants in**
   **Violation of Georgia Statutes Regarding Foreclosure and Sale**
   **Under Power of Subject Property.** During the month of December,
   2011 two different alleged Secured Creditors have advertised to
   foreclose and sell Plaintiffs' Subject Property. The dissolved NCMC
   advertised three times, and BOA advertised one time as noted above
   and as attached herein **(Kenimer Affidavit & Exhibits 8 and 9).** As a

6

result Defendants have violated the requirements for advertising foreclosures and sales as mandated by O.C.G.A. § 44-14-162(a) and § 9-13-140 requiring advertisements weekly for four weeks. That has not been accomplished by any individual Defendant, therefore, the Foreclosure and Sale must be enjoined. Further, O.C.G.A. § 44-14-162.2 requires the secured creditor to notify the debtor/homeowner of the individual or entity with full authority to negotiate, amend, and modify all terms of the mortgage with the debtor, and the Notice must be given to the debtor by the secured creditor no later than 30 days before the date of the proposed foreclosure.

At present the Plaintiffs have received notifications from two different alleged secured creditors for a foreclosure and sale set for January 3, 2012, which is not possible under Plaintiffs' financing scheme. **(Kenimer Affidavit & Exhibits 7, 8, and 9).** The Fulton County property records indicate that BOA has the latest assignment dated in 2010. However, Plaintiffs' have received written notification within the last week that BOA does not have any legal or financial interest, whatsoever, in the Subject Property, and BOA did not advertise for four weeks, nor give 30 days notice of the identification

7

of the secured creditor under O.C.G.A. § 44-14-162.2. **(Kenimer Affidavit & Exhibits 4, 10 and 11).**

NCMC has no assignment on file in the county property record office that is current. NCMC is a dissolved corporation, NCMC did not advertise for four weeks as required, and NCMC's secured creditor status is suspect since the corporation was dissolved and does not exist. Therefore an injunction is mandated because all pretender secured creditors did not fulfill their obligations under the Georgia foreclosure notice and advertising statutes. **(Kenimer Affidavit & Exhibits 8, 9, 10, and 11).**

2. **Current Loan Modification Process:** Plaintiffs are a married couple who have lived at 4402 Whitewater Creek Road, Atlanta, for approximately 10 years. They have been and are currently in the midst of a loan modification program, which process was begun almost 2 years ago so that Plaintiffs could work out an arrangement with Defendants to refinance the mortgage loan on their home. Since Plaintiffs first executed a mortgage on the Subject Property in 1997 and refinanced in 2003. Plaintiffs voluntarily accelerated payments of additional principal for 5-6 years, paying down the mortgage by half; a 50% reduction in the principal in addition to all interest owed.

8

Plaintiffs paid the original $950,000 mortgage down to $500,000 in 5-6 years, thereby paying ahead on their mortgage by months or years, unlike many other homeowners.

When the recession hit Plaintiffs were adversely affected so they contacted their Servicer, PNC Mortgage and simply asked to extend the term of the 50% reduced mortgage to thirty years. They did not ask for principal or interest reductions. Plaintiffs have been and remain in active loan modification efforts despite the Lender and Servicer abuse they have suffered. Regardless, Lenders and Servicers are not allowed to foreclose on homeowners in active loan modification programs such as Plaintiffs. It is improper to foreclose on Plaintiffs in the middle of a loan modification process under federal loan modification programs, rules and regulations, HAMP and MHAP programs, Federal Reserve and OCC Consent Orders with PNC and other banks and Servicers, as well as OCC memoranda and guidelines. **(Kenimer Affidavit & Exhibits 15, 16, 17, 18, 19, 20, 21, 22, 24, 26, 27, 28, 29, 30, 31, 35 and 36).**

3. **Mortgage Abuse; Wrongful Attempted Foreclosure:** Plaintiffs have suffered Servicer and Lender abuse because they were told repeatedly and incorrectly that the federal HAMP programs required a

9

homeowner to be 60-90 days late on mortgage payments in order to qualify for a loan modification. This assertion by Defendants is untrue and illegal but was intentionally and deliberately repeated to Plaintiffs until they acquiesced. **(Kenimer Affidavit & Exhibits 15, 16, 17 and 18).** By Defendants' inducing Plaintiffs to breach their contract they became 60-90 days past due, whereupon Defendants declared them in default and started charging thousands of dollars of different types of fees because of the default status that they induced Plaintiffs to realize. This Mortgage Servicer scheme is subject to class action lawsuits all over the country, and has come to be known as "Luring Homeowners into Default for Profit," an ugly and horrendous scheme perpetrated on homeowners by numerous Servicers like PNC Mortgage, Wells Fargo Mortgage and others. Elsewhere in the country, homeowners individually and in class actions have sued these Defendants and others for many of the same causes of action. Such mortgage abuse and wrongful attempted foreclosure is prohibited by law. **(Kenimer Affidavit & Exhibit 14).**

4. **No Standing:** The Defendants have no Standing to bring a foreclosure action against the Plaintiffs as none of the Defendants are a proper party, are not the Secured Creditor, and are not the Real Party in

Interest in relation to the Subject Property of the Plaintiffs under Georgia law; One foreclosing Defendant, NCMC has no current Assignment in the Fulton County clerk's property office of any beneficial or ownership interest in the note or deed to secure debt as related to the Subject Property of the Plaintiffs from the original lender Brookhaven Mortgage or from the purported successor/assign Bank of America, NA, on record or before this Court. In fact, as stated, this alleged secured creditor, NCMC, was dissolved in 2008.

The other advertising purported secured creditor, Defendant BOA admits no standing in attached correspondence before the Court, and has denied any ability to negotiate or modify the mortgage loan, or to have any legal or financial interest in the Subject Property. Thus, neither NCMC nor BOA have any standing to foreclose on the Subject Property. Lack of standing prevents foreclosure on Plaintiffs property. **(Kenimer Affidavit & Exhibits 2, 3, 4, 6, 27, 28, and 29)).**

5. **Violations of Georgia Law on Foreclosure and Sale:** The Defendants have not advertised the property properly as required by law, nor sent to the Plaintiffs proper Notice of Sale Under Power meeting the requirements of O.C.G.A. 44-14-1629a) and 44-14-162.2. Such violations of Georgia law prohibit foreclosure.

11

6. **Servicer and Lender Abuse:** Plaintiffs have been attempting to work with Defendant, PNC Mortgage (herein after "PNC"), purported servicer for National City Home Mortgage, (a servicer for National City Bank, NA) to perfect a loan modification and refinancing of their home for the last 14-22 months, despite being lured into default for profit by Defendants and PNC Bank Officials.

While working with Defendant PNC Bank on the so-called loan modification program, Plaintiffs have endured four (4) advertised and illegally attempted foreclosure sales of their home, the Subject Property, within a six (6) month period in 2011, in July, October, November and December of 2011.The four foreclosure and sale notices and advertising was sent and published by either Bank of America, NA and/or National City Mortgage Company . **(Kenimer Affidavit & Exhibits 7, 8, 9, 10 11, 19, 25, 33 and 34).**

In addition to suffering constant foreclosure threats, Plaintiffs paid thousands of dollars for the privilege of applying for loan modification programs . However, after successfully complying with all requirements and submissions for the loan modifications the Servicer and Lender repeatedly denied them. Since then, Plaintiffs have worked with Defendants on their mortgage modification

program, and have spent countless hours repeatedly sending paperwork, documents, letters, emails, and making phone calls trying to find someone in authority to approve their loan modification. As the attached Exhibits indicate Plaintiffs are both employed, and make considerable amounts of money, but have never been able to get PNC to complete the process. PNC assigned a point of contact for Plaintiffs, but in one and a half years Plaintiffs have never been able to contact him after numerous attempts. Defendants, PNC officials, have toyed with and abused Plaintiffs about the owner/investor of their mortgage in violation of law. They were told it was a "group" of investors; that it was **"Allen Iverson",** the former NBA star; that "different people" were the investors, and these investors refused to be identified, and were thus far unwilling to grant a loan modification.

Nevertheless, Plaintiffs were always being told by Defendant's officials that Plaintiffs would never have to worry about losing their home, and the Servicer and Lender would work out some other loan modification program. Plaintiffs were told that Defendants had the authority to approve loan modifications verbally and in writing. However, Defendant PNC Bank told Plaintiffs that it was illegal for them to tell them who the owner was on the mortgage note in

violation of law. **(Kenimer Affidavit & Exhibits 30, 15-22).** An injunction is necessary and proper to stop the scheduled foreclosure because of the bad faith, unclean hands and violation of law by Defendants.

7. **Loan Modification Breach of Contract:** As stated previously Plaintiffs did everything they were asked to do by the Servicer handling all loan modification programs. They were approved for loan modification programs, then the so-called lender or lenders allegedly disqualified them. However, the Servicer refused to give any reasons for any acceptance, then rejection, and refused to identify the lender or secured party or owner of Plaintiffs mortgage note at any time. In fact, the Servicer toyed and abused Plaintiffs by intentionally misrepresenting who the lenders/owners were, including suggesting "groups" of lenders, Allen Iverson, the NBA basketball player, or other variations. Plaintiffs were frustrated that so many times they were told a loan modification was worked out, or a sure thing, and then it was not.

Plaintiffs came to believe they were being punished for paying down their mortgage by 50%, being lured into default for profit, and being charged excessive fees and costs because they could afford to

pay. Further, if Defendants eventually coerced Plaintiffs into foreclosure and sale, Defendants could sell the property for twice what was owed, plus the lender placed insurance, lured default fees and charges, attorney's fees, mystery fees and many other expenses and fees.

Accordingly, Defendants have intentionally breached the loan modification agreements worked out numerous times with Plaintiffs, out of greed and by intentional misrepresentation. Defendants have refused to identify reasons for late announced disqualifications and refused to identify the actual lender/owner, that Plaintiffs were led to believe existed. Of course this refusal to identify the investor/lender is a direct violation of RESPA. Similar to recent cases in Georgia in the Superior and Federal Courts, Lenders and Servicers breach contracts when they agree to loan modifications, and then arbitrarily cancel the agreement. Accordingly, Defendants may not foreclose Plaintiffs because they intentionally breached agreements, and cannot be allowed to profit from their bad faith and improper acts. **(Kenimer Affidavit & Exhibits 12-15).**

8. **RESPA Violations for Attempting to Foreclose During Pending Qualified Written Request (QWR) Sent by Plaintiffs to**

> **Defendants:** After many months of the runaround by PNC and failure to have important questions answered, Plaintiffs through their representatives sent detailed QWRs to Defendants in the beginning of December, 2011, coincidentally two days before Plaintiffs received this month's foreclosure notice. Responses from Defendants have not come back in any definitive fashion as yet. Accordingly, by federal law under RESPA Defendants may not foreclose on Plaintiffs during the pendency of a QWR. This is an absolute federal legal requirement and an injunction is necessary to ensure that federal law protecting consumers and homeowners is followed. **(Kenimer Affidavit & Exhibits 13-37).**

Plaintiffs and their family will be irreparably harmed if this injunction is not granted; they will be forced out of their home, even though Defendants have failed to satisfy the technical and basic requirements of Georgia Statutes mandating proper notice and advertising prior to foreclosure. Plaintiffs have negotiated in good faith and followed all instructions of the Defendants during the loan modification process explicitly and continuously. Defendants have no standing to bring a foreclosure action and sale of Plaintiffs' property because of their numerous illegal and inequitable activities with respect to Plaintiffs and other homeowners. Defendants have committed lender and servicer abuse, violated

16

RESPA numerous times, violated Georgia law, breached contracts and agreements with Plaintiffs and proceeded with foreclosure despite a total prohibition in federal law due to a pending QWR. While Plaintiffs will suffer irreparably, Defendants will not be harmed by maintaining the status quo. Therefore, the Court is urged to issue an injunction prohibiting and enjoining Defendants from foreclosing and selling the Subject Property, and requiring Defendants to provide an accounting and proper answers to Plaintiffs' QWR, and cease their Lender and Servicer abuse and harassment and improper acts against Plaintiffs.

9.**) DEFENDANTS NATIONAL CITY MORTGAGE COMPANY AND BANK OF AMERICA, N.A. HAVE NO STANDING TO PURSUE A FORECLOSURE  ACTION AND SALE AGAINST PLAINTIFFS AS DEFENDANTS WHO BROUGHT THIS FORECLOSURE ACTION ARE NOT THE SECURED CREDITOR NOR REAL PARTY IN INTEREST NCMC WAS DISSOLVED IN 2008 BY MERGER WITH PNC BANK, N. A. AND BANK OF AMERICA, N.A. DISAVOWED STANDING IN WRITING ON DECEMBER 21, 2011.**

The proper party, investor, or secured creditor, is unknown at this time as there are no documents or assignments of beneficial interest from the latest Assignee, Bank of America, N.A. to National City Mortgage Company or PNC Bank. However, the Notices of Sale Under Power identified Bank of America and National City Mortgage Company to Plaintiffs in the O.C.G.A. § 44-14-162.2 Notice, and no security instrument or assignment vesting the purported secured creditor, National City Mortgage Company, with title to the security instrument has

17

been filed with the Fulton County Clerk of Court by Monday, January 2, 2012 prior to the sale as required by O.C.G.A. § 44-14-162(b).

Plaintiffs' security deed states that Brookhaven Mortgage is the entity to whom the debt is owed, and "the entity that has full authority to negotiate, amend, and modify all terms of the mortgage with the debtor," which is the statutorily required O.C.G.A. §44-14-162.2 Notice dated December 3, 2010.

Plaintiffs's Security Deed recorded October 10, 2008 lists Brookhaven Mortgage Company as the mortgagee immediately assigning all beneficial interest in the security deed to National City Mortgage Company which no longer exists due to dissolution and merger. Defendants' most recent demand letter and Notice of Sale Under Power to Plaintiffs as well as the other three (3) such notices and numerous other letters from Defendants' attorneys received by Plaintiffs have always listed PNC Bank as the Secured Creditor.

The O.C.G.A. § 44-14-162.2 Notice received by Plaintiffs prior to the scheduled sale which as required by statute states that *"notice ...shall include the name, address, and telephone number of the individual or entity who shall have full authority to negotiate, amend, and modify all terms of the mortgage with debtor."* For months Plaintiffs has been negotiating in good faith with PNC Mortgage, the listed Secured Creditor, but now on the eve of foreclosure Plaintiffs are told that the apparent Real Party in Interest who makes the decisions is

18

National City Mortgage Company. This means that the O.C.G.A. § 44-14-162.2 Notice is false, the prior notices may be false, that Plaintiffs has intentionally concealed the Real Party in Interest and National City Mortgage Company (a long defunct entity) has absolutely NO STANDING to attempt to foreclose on Plaintiffs' property since they have not followed Georgia law properly as well as intentionally deceived Plaintiffs who has wasted almost two years trying to work out modification of their mortgage in good faith.

Accordingly, Defendants have concocted a sham upon Plaintiffs and upon this Court by not being truthful about the proper secured creditor as required by Georgia law. First, Defendants listed Bank of America as the creditor. Second, Defendants named National City Mortgage Company, another entity, albeit presumably not a subsidiary as the O.C.G.A. 44-14-162.2 entity with full authority to negotiate with Plaintiffs and modify the mortgage. However, subsidiary or not, Bank of America and National City Mortgage Company are separate companies or entities, and there was never any assignment recorded in Fulton County assigning National City Mortgage Company any authority over Plaintiffs as a creditor, secured creditor, or the entity with full authority. Despite the published representations in recent months by Bank of America and National City Mortgage, alleging they had full authority to negotiate with Plaintiffs per O.C.G.A. 44-14-162.2, in actuality they did not.

Further, we certainly do not need to remind the court of Georgia law making it a felony to file fraudulent affidavits or make false oaths with respect to claiming title to real property, or that National City Mortgage Company and Bank of America and PNC Bank have been found to have collaborated with debt collectors and unscrupulous law firms to engage in wrongful foreclosure, mortgage abuse and fraud all over the country, and are the subject of numerous investigations by state and federal officials for their foreclosure abuse, but a few details bear repeating.

Under O.C.G.A. § 44-2-43 "Any person who (1) fraudulently obtains or attempts to obtain a decree of registration of title to any land or interest therein; (2) knowingly offers in evidence any forged or fraudulent document in the course of any proceedings with regard to registered lands or any interests therein….(6) makes any false oath or affidavit with respect to any matter or thing provided for in this article; or (7) makes or knowingly uses any counterfeit or any certificate provided for by this article shall be guilty of a felony and shall be punished by imprisonment for not less than one nor more than ten years." Depending on what documents may appear and when Defendants may well be in violation of Georgia criminal law. They clearly are guilty of intentional deceit and fraud against the Plaintiffs. They led them down the primrose path for a long time. Had this court not heard this matter it is very likely that Defendants would have staged a foreclosure, sold the Plaintiffs' home, thrown the Plaintiffs' out of their home, and

later filed the proper assignments and other legal documents, all in violation of several Georgia statutes, and no one would have been the wiser. That is the pattern PNC Bank, Bank of America and other big banks and mortgage companies have followed for a number of years when greed and profits became more important than working with customers.

How and why National City Mortgage Company got involved again in the chain of title to the property of the Plaintiffs is, presumably, that it was granted an assignment from Bank of America, N.A. and never recorded any assignment with the Fulton County Superior Court Clerk of Courts. However, as of this morning, December 30, 2011, on the eve of the planned foreclosure sale by either NCMC or BOA, there was nothing filed in the clerk's office documenting the assignment and acknowledging National City Mortgage Company or Bank of America as the Secured Creditor and holder of the Security Instrument. Instead, Defendants went to great efforts to conceal the investor, and to keep Plaintiffs in the dark while he and his wife fretfully tried to save their home, all the while dealing with a fictitious creditor, not the secured creditor.

It is preposterous to imagine the arrogance and conceit that the Defendants must relish that they can flaunt any legal and moral obligation to mortgagors like the Plaintiffs, forcing them to jump through hoops like little dogs in the circus, laughing all the while that PNC Mortgage and National City Mortgage Company

21

never had the authority to modify anything for the Plaintiffs or anyone else whose mortgages they serviced without informing them of the true owners. This concealment and fraud is a nationwide crisis and tragedy. These type actions undermine American trust in the entire financial system. By any standard measure the Defendants and their attorneys are under a legal or moral obligation to notify the Plaintiffs that the Secured Creditor had changed. But intentionally they did not.

Around the country and in every state in the nation there is a mortgage crisis led by Bank of America and PNC Bank and other large banks and bank-owned mortgage subsidiaries that have proliferated robo-signing of affidavits, filed false and perjurous affidavits with courts, foreclosed on homeowners with legally insufficient documentation, staged multiple foreclosures on the same property, deceived homeowners, courts, Congress, state legislatures, and the public about the extent of their wrongdoing, greed and fraud. Then, banks like Wells Fargo put on a show over mortgage modification, charge cash strapped people for the privilege of being rejected, pile on fees and costs because it is more profitable to foreclose than to modify a mortgage, does not give National City Mortgage Company or any of the Defendants the right to ignore Georgia law and thumb its nose at Georgia's citizens and courts.

**10.) THE TRUTH IN LENDING ACT, 15 U.S.C. § 1641(g)(1)(A)-(E) HAS BEEN VIOLATED BY DEFENDANTS IN THAT NO NOTICE OR DISCLOSURE IN COMPLIANCE WITH THE ACT WAS PROVIDED TO PLAINTIFFS WHEN THE OWNERSHIP OF THE PLAINTIFFS'S MORTGAGE WAS TRANSFERRED OR ASSIGNED TO PNC BANK, N.A., BANK OF AMERICA, N.A. OR NATIONAL CITY MORTGAGE COMPANY. FOR THIS REASON ALSO THE INJUNCTION SHOULD BE GRANTED SO PLAINTIFFS WILL HAVE TIME TO RESPOND TO SAID VIOLATIONS. OTHERWISE PLAINTIFFS WILL BE SEVERELY PREJUDICED.**

Plaintiffs have never been informed by any of the Defendants of the changed of beneficial ownership as required the Truth in Lending Act. For this reason alone, besides the fact that NCMC and BOA have published competing Notices of Sale Under Power in the month of December 2011. Such a change in the identity of the Secured Creditor without proper legal notice is typical of the Defendants with regard to the treatment of the Plaintiffs

## 11.) HAMP PROHIBITS FORECLOSURE DURING THE LOAN MODIFICATION PROCESS.

The Defendants are all subject to the mandates contained within the MHA Handbook v3.4, published on December 15, 2011. Sections 3.1 through 4 prohibit the Defendants as entities subject to the HAMP requirements from foreclosing in the manner in which this foreclosure has transpired. The HAMP requirements have not been met by any of the Defendants nor

honestly and seriously attempted by the Defendants in this case as evidenced

by the Exhibits attached to this Memorandum.

## 12.) THE STANDING OCC CONSENT ORDERS SIGNED BY ALL OF THE DEFENDANTS PROHIBITS FORECLOSURE PRIOR TO EXHAUSTION OF LOAN MODIFICATION PROGRAMS

Each of the Defendants has signed and is subject to the standing OCC

Consent Orders and the requirements contained therein. These OCC Orders

require the Defendants to engage borrowers in meaningful, substantive, one

person contact for the management of their loan among other things.

Foreclosure is prohibited by these Orders and agreed to by the Defendants

until a full exhaustion of possible alternatives and loan modification are

exhausted with each borrower and home owner, the Plaintiffs among that

number. Defendants have never engaged the Plaintiffs in meaningful and

substantive one person contact any of the Defendants in fact it seems to the

Plaintiffs that they have been purposefully led astray and deceived,

misguided and lied to by all of the Defendants as none of the requirements

of these standing Orders from the Comptroller of Currency have been met or

complied with by any of the Defendants regarding the loan and mortgage of

the Plaintiffs.

## 13.) PLAINTIFFS HAVE SUBMITTED A QUALIFIED WRITTEN REQUEST TO ALL OF THE DEFENDANTS DATED DECEMBER 2, 2011 IN WHICH THE PLAINTIFFS DISPUTE THE ALLEGED

**DEBT AND PENDING RESOLUTION OF THE QUALIFIED WRITTEN REQUEST DEFENDANTS ARE PROHIBITED FROM PROCEEDING WITH COLLECTION OF THE DEB T PURSUANT TO 15 U.S.C. 1692(g).**

On December 2, 2011, Plaintiffs sent a Qualified Written Request to all of the Defendants disputing the alleged debt. 15 U.S.C. 1692(g) prohibits further attempts at collection of the alleged debt by the Defendants until the Request is fulfilled.

Plaintiffs have disputed the amount of the debt in question in its entirety, have asked for an accounting of the servicing of their loan, proper calculations of the application of payments they have made on their home and requested proof that one of the Defendants in deed owns the loan and mortgage thereby giving one of the Defendants rights to repayment and standing to foreclose if indeed the Plaintiffs were truly in Default, which they were not.

**14.) PLAINTIFFS WILL BE IRREPARABLY HARMED IF THE REQUESTED INJUNCTION IS NOT GRANTED. DEFENDANTS WILL NOT BE HARMED BY MAINTAINING THE STATUS QUO AS DEFENDANTS HAVE POSTPONED PRIOR SCHEDULED FORECLOSURE SALES ON THIS PROPERTY THREE TIMES PREVIOUSLY.**

Foreclosure sales on Plaintiffs' property have been scheduled and advertised three different times previously, but were postponed by Defendants for no

apparent purpose. Therefore there is no sense of urgency in holding the
foreclosure sale on this property Tuesday, January 3, 2012. Because of
Defendants' past history of willingly postponing three prior foreclosure
sales, Defendants will not be prejudiced or irreparably harmed by enjoining
and delaying the planned foreclosure sale set for Tuesday, January 3, 2012.
The Plaintiffs, Edward Kenimer, Jr and his wife Patricia Sibley, on the other
hand, will most definitely be irreparably harmed as the family will be thrown
out of their home. Therefore the court should enjoin the foreclosure sale and
allow Plaintiffs and Defendants time to seek to resolve the mortgage
modification issues now under discussion with the appropriate parties.

## STATEMENT OF LAW SHOWING SUFFICIENT GROUNDS FOR INJUNCTION

### II. THIS HONORABLE COURT SHOULD ENTER A TEMPORARY RESTRAINING ORDER PENDING HEARING ON THIS MATTER.

### A. This Court Has the Authority to Grant the Relief Requested.

O.C.G.A. §9-11-65(b) allows a court to grant a temporary restraining order
without written or oral notice to the adverse party "if (1) [i]t clearly appears from
specific facts shown by affidavit or by the verified complaint that immediate and
irreparable injury, loss, or damage will result to the applicant before the adverse
party or his attorney can be heard in opposition; and (2) [t]he applicant's attorney

certifies to the court, in writing, the efforts... which have been made to give the notice and the reasons supporting the party's claim that notice should not be required." So long as these two requirements are fulfilled, the trial court has jurisdiction to issue an *ex parte* temporary restraining order. Smith v. Guest Pond Club, Inc., 277 Ga. 143, 144 (2003). Steward v. McLean, 252 Ga. 455, 456 (1984). Furthermore, Pursuant to O.C.G.A. 9-5-1, this Court may enjoin "a threatened or existing tort, or any other act of private individual or corporation which is illegal or contrary to equity and good conscience and for which no adequate remedy is provided by law."

# B. Standard for Temporary Restraining Order and Preliminary Injunction.

The decision to grant interlocutory injunctive relief rests in the sound discretion of the trial judge, which will not be disturbed absent a manifest abuse of discretion. Glen Oak, Inc. v. Henderson, 258 Ga. 455, 456 (1988). This Court has broad discretion in that regard. See Avnet, Inc. v. Wyle Labs., Inc., 263 Ga. 615, 616 (1993). While Plaintiffs in this instance *would* be irreparably harmed if the scheduled foreclosure of January 4, 2011 is not enjoined, an applicant for an interlocutory injunction need not demonstrate irreparable injury as a prerequisite to entitlement of interlocutory injunctive relief as an absolute requirement. Parker v. Glory Lakes Recreation Ass'n. Inc., 272 Ga. 44, 45 (2000); Jackson v. Delk, 257

Ga. 541 (1987). Instead, the sole purpose for granting an interlocutory injunction is to preserve the status quo of the parties pending a final adjudication of the case. Poe & Brown of Georgia, Inc. v. Gill, 268 Ga. 749, 750 (1997).

To prevail on this motion, the moving party typically must show: (1) a substantial likelihood of succeeding on the merits; (2) a substantial threat of irreparable injury if relief is denied; (3) that its own injury would outweigh the injury to the opposing party should relief be granted; and (4) that the injunction would not disserve the public interest. Gold Coast Publ'ns., Inc. v. Corrigan, 42 F. 3d 1336, 1343 (11th Cir. 1994). The same standard applies to a request for a temporary restraining order. Ingram v. Ault, 50 F.3d 898, 900 (11th Cir. 1995).

An applicant for a preliminary injunction need not make out a case which will entitle it to the ultimate relief it seeks, but need only raise a fair question as to the existence of the claimed right. R.D. Brown Contrs., Inc. v. Bd. of Educ. Of Columbia County, 280 Ga. 210, 212 (Ga. 2006); Limestone Development Corp. v. Village of Lemont, 284 Ill. App. 3d 848, 853-54, 672 N.E. 2d 763, 767-68 (1st Dist. 1996). Here, the evidence will establish each of the above facts and that Plaintiffs is entitled to a temporary restraining order and preliminary injunction enjoining the foreclosure of Plaintiffs's Property.

## C. **Plaintiffs Will Suffer Immediate and Irreparable Injury**

28

As Plaintiffs faces foreclosure on his home, he will suffer immediate and irreparably injury if foreclosure is not enjoined by this Court. West v. Koufman, 259 Ga. 505 (1989). As stated, the very purpose for granting an interlocutory injunction is to preserve the status quo pending final adjudication. Id. Plaintiffs' allegations and the evidence that support those allegations are sufficient to warrant an interlocutory injunction here. Id. Without doubt, Plaintiffs' losing their home is irreparable injury which would be catastrophic under the circumstances.

## D. It is Likely Plaintiffs Will Succeed on the Merits.

Plaintiffs alleges that 1) while Plaintiffs has been negotiating a mortgage modification in good faith Defendants claimed to be the ultimate decision-makers, but Plaintiffs learned that is not true; 2) Plaintiffs would suffer irreparable harm but Defendants would not by maintaining the status quo; 3) Defendants do not have standing to bring a foreclosure action since Defendants are not the Real Party in Interest and/ or the Secured Creditor they claimed and/or Defendants gave Plaintiffs in faulty Notice pursuant to O.C.G.A. §44-14-162.2, and the actual Real Party in Interest has not filed a security instrument prior to sale as required by O.C.G.A. §44-16-162(b). If proven true, Georgia law provides for relief from such actions. West, *supra.*

Moreover, courts outside of Georgia have not hesitated to harshly sanction "inequitable, unconscionable, vexatious and opprobrious" conduct on the part of

29

mortgage holders. For example, a few months ago the Supreme Court of New Jersey stopped all foreclosures in the state because of foreclosure and mortgage abuse by big banks and mortgage banks.

As such, and considering that Plaintiffs can document and evidence his allegations against Defendants, it is likely Plaintiffs will succeed on the merits and the foreclosure on Plaintiffs' home should be enjoined.

## E.     Injury to Plaintiffs Outweighs Potential Injury to Defendant.

As stated, to prevail on a motion of this nature, the moving party typically must show that its own injury would outweigh the injury to the opposing party should relief be granted.  Gold Coast, 42 F. 3d at 1343 (11th Cir. 1994). If Plaintiffs's allegations prove true, then the improper loss of his home would outweigh any potential "injury" to Defendants pending resolution – here, delaying foreclosure. The purpose for granting an interlocutory injunction is to preserve the status quo pending final adjudication. West, supra. The status quo would be destroyed if the January 4, 20101 foreclosure is not enjoined. Hence, Plaintiffs's injury would outweigh any injury to Defendant here.

## F.     An Injunction here would Serve the Public Interest.

Also as mentioned above, to prevail on a motion of this nature, the moving party typically must show that the injunction would not disserve the public interest. Gold Coast, 42 F. 3d at 1343 (11th Cir. 1994). Here, the injunction sought would

*serve* the public interest. Inarguably, the public has an interest in maintaining homeownership and requiring that legal standards such as standing are maintained, especially considering the percentage of the public that have mortgages on their property. Additionally, the Defendants in question recently received billions of taxpayer dollars from the federal TARP legislation, and now seek to abuse the power they have been granted by hasty ill-conceived foreclosures against taxpayers who funded their survival from bankruptcy and dismantling. This court's equity powers must be used to prevent such injurious harm to one who has been wronged. Moreover, the allegations by Plaintiffs in this instance could easily preclude Defendant from foreclosing on Plaintiffs' home since they lack standing. As such, grant of an interlocutory injunction here is proper. West, 259 Ga. 506 ("In this case, West's breach of this duty might preclude him from insisting on strict compliance with the default provision in the deed. We therefore conclude that the trial court acted within its discretion in granting the interlocutory injunction pending final adjudication…").

## G. No Bond Should Be Required.

O.C.G.A. § 9-11-65(c) provides that it is within the discretion of the court to decide whether or not a bond should be required in connection with the granting of injunctive relief. When injunctive relief is issued after notice and hearing, the trial court may issue an injunction without bond. Ebon Found. V. Oatman, 269 Ga.

31

340, 344 (Ga. 1998; Central Water Works Supply, Inc. v. Fisher, supra, 240 Ill.

App. 3d at 960, 608 N.E. 2d at 624; Falcon, Ltd. V. Corr's Natural Beverages, Inc.,

165 Ill. App. 3d 815, 822, 520 N.E. 2d 831, 835 (1st Dist. 1987). Requiring bond

here would effectively punish Plaintiffs for Defendant's misdoings and no bond

should be required here.

The Plaintiffs by their attorneys attempted to contact the attorneys of the

Defendants, McCurdy & Candler at 3:15 pm on December 30, 2011.

## CONCLUSION

The Court should enter Plaintiffs' request for a Temporary Restraining

Order and preliminary injunction to enjoin Defendants from foreclosing on the

subject Property on January 3, 2012.

Respectfully submitted, $\underline{\text{Dec } 30}$, 2011:

**THOMPSON LAW GROUP, LLC**

Robert Thompson, Jr., Esq.
Georgia Bar No. 709750
Seth Katz, Esq.
Georgia Bar No. 197411
**Thompson Law Group, LLC**
P.O. Box 53484
Atlanta, Georgia 30355
Telephone: (404) 816-0500
Facsimile: (404) 816-6856
rthompson@thomlaw.net
skatz@thomlaw.net

Office Address:
**Thompson Law Group, LLC**
Ivy Place
3423 Piedmont Road
Suite 530
Atlanta, Georgia  30305



**THE SUPERIOR COURT FOR THE COUNTY OF FULTON**
**STATE OF GEORGIA**

|  |  |
|---|---|
| **PATRICIA SIBLEY &** | ) |
| **EDWARD KENIMER, JR.,** | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **NATIONAL CITY MORTGAGE** | ) |
| **COMPANY; NATIONAL CITY** | ) |
| **BANK, N.A., PNC MORTGAGE,** | ) |
| **A DIVISION OF PNC BANK, NA;** | ) |
| **BANK OF AMERICA, NA;  &** | ) |
| **UNIDENTIFIED INVESTORS,** | ) |
| **CREDITORS,  REAL PARTIES** | ) |
| **IN INTEREST & AGENTS  NOT** | ) |
| **YET  IDENTIFIED** | ) |
|  | ) |
| **Defendants.** | ) |

FILED IN OFFICE

DEC 8 0 2011

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

Civil Action File No. 2011CV209?

## AFFIDAVIT OF EDWARD KENIMER

I, EDWARD KENIMER, did personally appear before the undersigned

officer, duty authorized by law to administer oaths, and having been first duly

sworn, upon oath depose and say based on my personal knowledge the following:

1.

I am over the age of eighteen and laboring under no disabilities.

2.

In September 1997 my wife Patricia C. Sibley and I bought our home in

Atlanta at 4402 Whitewater Creek Road NW, Atlanta, Georgia 30327. We

refinanced our home with Brookhaven Mortgage in July 2003, and the deed to

secure debt was assigned to National City Mortgage Company. (Ex. 2 and 3)

3.

The legal description of the property where our house is located is:

"All that tract or parcel of land lying and being in Land Lot 214, 17th District,

Fulton County, Georgia, Being Lot 2, Block E, Section Two of Whitewater Creek

Colony Subdivision, as per plat recorded in Plat Book 87, Page 70, Fulton County

Georgia Records. (Ex. 2)

4.

My wife Patricia and I have been married 25 years. We have operated very

successful businesses have taught and coached in schools, and motivated many

young people and students. I have been a real estate agent and a high school

teacher and coach, in addition to helping raise our two children. My wife, Patricia

has been in the advertising industry for over 35 years. From 2003-2009 her firm

Media Solutions was consistently recognized by the Atlanta Business Chronicle as

being on the Top 10 Largest Woman Owned Businesses in Atlanta. Unfortunately, in 2009, the media advertising essentially stopped with the Great Recession eventually causing her to close down operations in the beginning of 2010, laying off 21 people which caused economic hardship for us as well as many others I know. (Ex. 1)

5.

In reviewing Court records I learned that Bank of America, N.A. received an Assignment of our Deed to Secure Debt on March 7, 2011. We never received notice of this transfer of ownership. (Ex. 4)

6.

Between 2002-2003, we paid down our mortgage $30,000 and refinanced with National City Mortgage at a lower interest rate for $920,000.

7.

We continued to pay down on our mortgage with National City Mortgage from 2003 to mid-2010, paying over $772,000 in payments from September 1, 2003 to January 30, 2010. In fact, we reduced the principle on our mortgage with National City Mortgage between 2002 to 2010 from $950,000 to $504,000 (Exhibit E), or a total of $446,000. In essence, we paid off half our mortgage plus interest (Exhibit 5).

8.

Sometime between 2008-2010 we found out that National City Bank had been purchased by PNC and that as part of the TARP program with money from the federal government, and we began receiving correspondence and documents from PNC Mortgage and that National City Mortgage Company was defunct and dissolved. (Ex. 6)

9.

In 2010 after my wife and I discussed her business matters at length, we were forced to make the decision to shut down her advertising business because the economy was so bad. Nevertheless, we had remained current on our mortgage payments to National City Bank and PNC Mortgage.

10.

In conjunction with the bad economy and reduced income, we wrote a letter to PNC Mortgage on January 18, 2010 explaining our hardships and requesting a loan modification, pointing at how much we had paid, but offering to pay the entire balance, and seeking an adjustment to reduce our monthly cost. (Exhibit 15)

11.

In May 2010 we called PNC and asked them about a loan modification and discussed our circumstances with a PNC representative. (Ex. 15)

12.

We received correspondence from PNC beginning May 24, 2010 and began the process of sending in extensive documentation to PNC for the Loan Modification. (Exhibits 15 and 16)

13.

In fact, over a 1 year period from June 2010 to June 2011, we have sent in the same or similar loan modification packets 5-6 different times, only to be told it was lost or never sent, or some other excuse even though we had fax receipt documentation. (Exhibits 17,18,20,21,22,30, and 31)

14.

In the summer of 2010 we attempted to speak and did speak to a number of PNC representatives who reported they did not have our paperwork. As a result, we received a letter in September 2010 when PNC wrote us saying we had been referred to the foreclosure department, despite our sending loan modification packages frequently. (Exhibit 33)

15.

On September 27, 2010 we wrote PNC Mortgage regarding the information we had received and also reminding PNC that we had sent a hardship letter in January 2010 before we were ever non-current on any payment. (Exhibit 34)

16.

About the same time, we received correspondence from PNC dated

September 29, 2010 referring us to the HAMP program. (Exhibit 35)

17.

For the HAMP program, we dutifully sent more and repeated loan

modification packets in October, November, and December. (Exhibits 17-22)

18.

In July 2011 we began receiving loan modifications from BOA. (Exhibit 24)

19.

We kept reading about banks such as PNC not following the HAMP

program, and our research supported our fear.(Exhibit 19) Sure enough, PNC

dropped us from the HAMP program and allegedly put us in the Making Home

Affordable program in November 2010.

20.

We continued to send repeated information to PNC and they would respond

wanting more. (Exhibits 15-22)

21.

We would call PNC and would be told that we were not communicating and

then told we could only speak to Mr. Ebaum. We called repeatedly for Mr. Ebaum,

including Oct 4th, Oct 7th, Oct 14th, Oct 19th, Oct 24th, Oct 26th, Nov 4th, Nov 15th,

Nov 17th, Dec 15th, Feb 21st 2011, Jan 1 2011, and Jan 22nd , 2011. (Exhibits 15-22, Exhibit 31)

22.

During all this time, neither of us could reach our assigned contact Mr. Elam. It was extremely frustrating. (Exhibits 35-36)

23.

In addition, we ended up sending loan modification packets 7-10 times or mostly the same materials and documents, but were repeatedly told that they had never been received, even though we had receipts for the mail services that delivered the packages.

24.

Throughout 2011, there was no change. We would get PNC letters refusing to assist us, to which we would retort with detailed responses to their inaccurate assessments based on their lack of representatives. (Exhibits 15-22, 35-36) We continually sent more documentation and responded to every inquiry from PNC.

25.

In May we were offered a chance to attend a PNC meeting to discuss what we proposed, which we attended.

26.

At the meeting, we were met by Lisa Gibson of PNC who was unfamiliar with our situation. We took all our paperwork again, received a notice, and made a proposal that they did not consider. Our proposal was to pay off the remaining debt on the house and quickly get current with the amount due. We never received a response. (Exhibit 30)

27.

We received a letter dated June 1, 2011 from McCurdy Candler informing us we were up for foreclosure. We called to respond to PNC's efforts. (Exhibit 23)

28.

We noticed something very strange on the McCurdy Candler letter in that they said Bank of America (BOA) was the creditor. This was news to us. (Exhibits 23 and 28)

29.

We looked back through all our records. We had no notification whatsoever that BOA was our creditor. The name BOA had never come up.

30.

Then we received a letter again from McCurdy Candler stating that our payoff was $121,188.92 by June 29th. In response we had offered to pay off $41,000 to restore our balance, but our offer had been ignored. (Exhibits 23 and 28)

31.

We also noted that in the McCurdy Candler payoff notice, they had tacked on $4,817.71 in junk fees, attorneys fees, and other items. (Exhibits 23 and 28)

32.

Eventually we had a final look over our property records and discovered our assignment dated Mar 2011 from PNC/NCMC to BOA. However, we had never received any notice or disclosure that BOA was our creditor. (Exhibit 4)

33.

We believed that banks were supposed to notify the homeowner if their loan was assigned to someone else or if the security was assigned. When we researched the matter, we were directed to the Truth In Lending Act under 1641 (g), where the law mandated that as of May 2010- banks were henceforth required to notify homeowner if their loan had been assigned to another creditor. This was never done and obviously is a violation of TILA. (Exhibit 26)

34.

During June we were constantly requested to provide additional and different financial data, to which we complied. (Exhibits 33-36) We then spoke again to Lisa Gibbons asking her who the real creditor was since we had not heard from BOA, and her understanding was that only creditors, not servicers could foreclose.

35.

Lisa responded with an even more confusing email saying that the deed had been bought by individual investors who demanded secrecy. We asked her about how this is not a violation TILA and get a company response which we considered a lie, from what we had researched, and based upon opinions of people in real estate and legal experts. (Exhibit 30)

36.

As we spoke with Lisa Gibson again she stressed that individual investors owned the loan and they required us to pay off all we owed and then they would consider a loan modification. We explained that we had been offering pay offs and trying to work out a loan modification before we were not current, but could never get a straight answer. (Exhibit 30)

37.

Lisa then told us that she could not tell us who the individual investors were who called all the shots but she met with <u>Allen Iverson</u> that week and she could not say anymore. Obviously the conclusion we reached was that NBA basketball star Allen Iverson was our investor. (Exhibit 30)

38.

That confused us even more because when we looked him up we saw a recent report when his own home was foreclosed on in Denver; that the police had stopped his Lamborghini which had expired tags, and that he had bought a house on W. Paces Ferry for $4 million. We did not know what to think nor could we figure out who really owned our deed that we could negotiate with.

### 39.

Lisa had told us that we might hear from hear from them about holding off on the foreclosure so we could work through this loan modification, and the earliest would be 72 hours before the foreclosure which meant Friday July 1, 2011. On Friday morning we sent an email to Lisa Gibson asking about any news on the foreclosure, but received no response.

### 40.

We did some more research to see if anything PNC said was honorable and found a Cease and Desist order signed by the Federal Reserve and PNC when PNC agreed to curb mortgage and foreclosure abuses. We also found other federal government orders and rules requiring loan modification, not foreclosure. At this point our fears were confirmed about this incompetent loan modification system. (Exhibits 26, 27, and 29)

41.

We also noted that the OCC had come out with additional legislation dealing with proper mortgage handling and to prevent mortgage abuse and loan modification abuse. (Exhibit 28)

42.

For the next 4-6 months, we were constantly receiving do nothing letters from PNC and foreclosure letters from attorneys McCurdy Candler. (Exhibits 25, 33, and 34)

43.

We also found that PNC was not registered in the state, but BOA was. (Exhibits 39, 40)

44.

We also found a lot of cases and articles blasting servicers like PNC for abuse such as luring into default for profit, and others for breach of contract on loan modifications, as well as RESPA which required servicers to identify lenders, which PNC would never do. (Exhibits 12, 13, 14, and 41)

45.

As if things were not bad enough, we were constantly harassed on the phone, by people driving by and taking pictures, and an agent of PNC drove up into our driveway, almost hit us with his car, and accosted us, refusing to identify himself

but trying to knock us down to put a notice on our door. We filed some criminal

trespass charges against the individual and spoke to the Atlanta police numerous

times about the harassment and trespass. (Exhibit 32)

46.

Out of frustration, we had our attorneys send a Qualified Written Request to

National City, PNC, and BOA on December 2, 2011 before we received the letters

from McCurdy Candler. (Exhibit 37)

47.

In early December, 2011 we received our 4th set of foreclosure letters from

McCurdy Candler. This time it listed National City Mortgage as the creditor. We

looked up Georgia foreclosure law on notice and it made no sense because

National City was defunct and dissolved. (Exhibits 7 and 6)

48.

We watched the Fulton County Daily Report and discovered that during

December 2011, National City Mortgage advertised as the creditor on December 5,

12, and 19; but then on December 27, 2011 BOA was advertising as the creditor.

This made no sense to us so we looked at the Georgia law online again about

proper advertising for foreclosures and realized that no one had advertised for 4

weeks and that did not receive the thirty days notice by BOA. (Exhibits 8, 9, and

11)

49.

Out attorneys informed us in mid-December that BOA had responded in part to the QWR, and had claimed they had no part as Servicer or Lender in our mortgage loan, and we were forwarded a letter from BOA stating such. (Exhibit 10)

50.

As a result, we remained confused because BOA had our assignment, which was in the clerk's property office we saw dated March 2011, but was denying any involvement with our mortgage loan. We were outraged at the lying, waste of time, ruining our credit, false letters and claims, shell game tactics about who the lender was or is, 4 foreclosure attempts and a two year nightmare that has affected our physical and mental health.

Further Affiant Sayeth Not:

Edward Kenimer, Jr.

Subscribed to and sworn before me this $\underline{30}$ day of December, 2011.

Ayrn Michelle Sedove

Notary Public



# EXHIBITS

A

# BIO OF PATRICIA C. SIBLEY
## MARKETING & BUSINESS CONSULTANT

Patricia (Pat) Sibley has been in the advertising industry for over 35 years. She is a graduate of Florida State University and moved to Atlanta after graduation. She spent 9 years on the agency side of the business before starting her first media buying service out of her house at the age of 30.

At the age of 35, and after the birth of her first child, she sold her interest in her first business to her partner and in1989, her second company MediaSolutions was started downstairs in her house. MediaSolutions ceased operations in April, 2010. Over the 21 years of the company's existence, the company billed over $500,000,000 in media billings and was the largest independent media buying company in the southeast. Since 2003, Media Solutions was consistently recognized by the Atlanta Business Chronicle as being in the Top 10 Largest Woman Owned Business in Atlanta, one of the Top 25 Largest Advertising and Marketing Agencies as well as being only one of four women listed in Georgia's Top 100 Privately Held Companies. Pat was named Female Entrepreneur of the year for 2006 by Atlanta Woman magazine, and has been named twice by Catalyst Magazine as one of Georgia's Top 50 Entrepreneurs.

Pat's experience in the advertising business allowed her to work in a wide variety of industries. Household Products, Banking and Financial Services, Political and Issue Advertising, Retail, Quick Serve Restaurants, Automotive are examples of the industries she has worked in just the past 10 years.

Pat has been married for 25 years to Ed Kenimer, a semi-retired teacher and coach in Atlanta and they have two children: Edward III is a rising junior at the Reinhardt University and Catherine is a rising senior at the University of South Carolina.

# Bio of Edward D. Kenimer, Jr.

Edward (Ed) Kenimer has been a Physical Education Teacher and Coach for over 20 years. As a second career, he was a successful real estate salesman and subdivision manager for 16 years in the Metro Atlanta area. A graduate of the University of Georgia, Kenimer earned his Masters of Education from the University of Georgia in 2000.

After teaching for 5 years in Gwinnett County, Kenimer became a realtor with Realty Marketing Group where he became a Life member of the Gwinnett County Board of Realtors Million Dollar Roundtable. In 1985, he married Patricia Sibley and moved to Atlanta. He associated with Skipper Morrison Realtors and earned the Atlanta Board of Realtors Lifetime Million Dollar Roundtable. In 1995, he went back into education and became a Teacher at Wesleyan School in Sandy Springs. There he taught Physical Education, Health, and Photography. He also coached Football, Basketball, Baseball, Cross Country, Track, and Soccer. In 2008, after his daughter's graduation from Wesleyan, he retired from teaching fulltime. Since 2009, he has been a substitute teacher for Trinity School, Holy Innocents' Episcopal School, and Wesleyan School.

Ed is an accomplished BBQ cook and has developed his own rubs and sauces packaged under the Buster K's label. In 2010, he and his wife became judges for Memphis BBQ Network. He also is an avid photographer and has studied at the Ansel Adams Gallery in Yosemite Park, and with acclaimed photographers, Joe McNalley, Joyce Tenneson, and Stephen Sint of New York.

Ed has been married for 25 years to Patricia Sibley. Pat has been in Atlanta since 1974 in the Advertising industry. They have two children: Edward will be a rising Junior at Reinhardt University and Catherine is a rising Senior at the University of South Carolina.



Deed Book 32728 Pg 319
Filed and Recorded Jul-11-2002 11:45am
2002-0211511
Real Estate Transfer Tax $8.00
Juanita Hicks
Clerk of Superior Court
Fulton County, Georgia

Return Recorded Document to:
Jackson W. Jones, P.C.
91 West Wieuca Road Building A, Suite 4000
Atlanta, GA 30342

## QUITCLAIM DEED

**STATE OF GEORGIA**          **COUNTY OF FULTON**          **FILE #: 020617J**

THIS INDENTURE, Made the **28th** day of **June, 2002**, between **PATRICIA C. SIBLEY AND EDWARD D. KENIMER, JR.**, of the County of FULTON, and the State of GEORGIA, as party or parties of the first part, hereinafter called Grantor, and **PATRICIA SIBLEY AND EDWARD KENIMER, JR AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP** of the county of FULTON, and the **State of Georgia**, as party or parties of the second part, hereinafter called Grantee (the words "Grantor" and Grantee" to include their respective heirs, successors and assigns where the context requires or permits).

WITNESSETH that: Grantor, for and in consideration of the sum of one dollar ($1.00) and other valuable considerations in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, by these presents does hereby remise, convey and forever QUITCLAIM unto the said Grantee,

### SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

TO HAVE AND TO HOLD the said described premises to grantee, so that neither grantor nor any person or persons claiming under grantor shall at any time, by any means or ways, have, claim or demand any right to title to said premises or appurtenances, or any rights thereof.

IN WITNESS WHEREOF, the Grantor has signed and sealed this deed, the day and year first above written.

Signed, sealed and delivered in the
presence of:

(Unofficial witness)

(Notary Public)

_____ (Seal)
**PATRICIA C. SIBLEY**

_____ (Seal)
**EDWARD D. KENIMER, JR.**

_____ (Seal)

Deed Book 32728 P₁  320
Juanita Hicks
Clerk of Superior Court
Fulton County, Georgia

EXHIBIT 'A'

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 214,
17ᵀᴴ DISTRICT, FULTON COUNTY, GEORGIA, BEING LOT 2, BLOCK E, SECTION
TWO OF WHITEWATER CREEK COLONY, AS PER PLAT RECORDED IN PLAT
BOOK 87, PAGE 70, FULTON COUNTY, GEORGIA RECORDS, WHICH PLAT IS
INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

**AFTER RECORDING RETURN TO:**
JACKSON W. JONES, P.C.
91 W. WIEUCA ROAD
BUILDING A SUITE 4000
ATLANTA GA 30342

Deed Book 32728 Pg  321
Filed and Recorded Jul-11-2002 11:45am
2002-0211512
Georgia Intangible Tax Paid $2,858.00
Juanita Hicks
Clerk of Superior Court
Fulton County, Georgia

RECORD AND RETURN TO:
NATIONAL CITY MORTGAGE CORP.
3232 NEWMARK DRIVE
MIAMISBURG, OHIO 45342

——————— [Space Above This Line for Recording Data] ———————

1356827

## SECURITY DEED

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JUNE 28, 2002
together with all Riders to this document.
(B) "Borrower" is
PATRICIA SIBLEY AND EDWARD KENIMER, JR., JOINT TENANTS

Borrower is the grantor under this Security Instrument.
(C) "Lender" is
BROOKHAVEN MORTGAGE

GEORGIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
GA51 : 04/01                                    (Page 1)

Form 3011 1/01


Deed Book 32728 Pg 322

1356827

Lender is a  SUB S CORPORATION
organized and existing under the laws of  THE STATE OF GEORGIA
Lender's address is
130 W. WIEUCA ROAD, SUITE 203, ATLANTA, GEORGIA 30342

Lender is the grantee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated  JUNE 28, 2002
The Note states that Borrower owes Lender
NINE HUNDRED FIFTY THOUSAND AND 00/100- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Dollars (U.S. $  950,000.00                    ) plus interest.  Borrower has promised to pay this debt
in regular Periodic Payments and to pay the debt in full not later than AUGUST 01, 2017
(E)  "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[  ] Adjustable Rate Rider [  ] Condominium Rider          [  ] Second Home Rider
[  ] Balloon Rider         [  ] Planned Unit Development Rider [  ] Biweekly Payment Rider
[  ] 1-4 Family Rider
[X] Other(s) [specify]
 Waiver of Borrower Rights

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and
other charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds
paid by any third party (other than insurance proceeds paid under the coverages described in Section 5)
for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of
the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to,
the value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default
on, the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under
the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter.  As
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
GA52 : 07/01                              (Page 2)

Deed Book 32728 Pg 323

1356827

used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the **COUNTY**                                        of **FULTON**                                        :

                  [Type of Recording Jurisdiction]                              [Name of Recording Jurisdiction]
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.**

which currently has the address of **4402 WHITEWATER CREEK ROAD**
                                                                        [Street]
**ATLANTA**                                        , **Georgia 30327**                              ("Property Address"):
                  [City]                                        [Zip Code]

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
GA53 : 07/01                                        (Page 3)

Deed Book 32728 Pg 324
|█▌█████▌██████▌█████████▌██

1356827

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow
Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in
U.S. currency. However, if any check or other instrument received by Lender as payment under the Note
or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent
payments due under the Note and this Security Instrument be made in one or more of the following
forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check
or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a
federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at
such other location as may be designated by Lender in accordance with the notice provisions in Section
15. Lender may return any payment or partial payment if the payment or partial payments are
insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to
bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such
payment or partial payments in the future, but Lender is not obligated to apply such payments at the time
such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then
Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower
makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time,
Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will
be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No
offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower
from making payments due under the Note and this Security Instrument or performing the covenants and
agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all
payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest
due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments
shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts
shall be applied first to late charges, second to any other amounts due under this Security Instrument, and
then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a
sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and
the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment
received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each
payment can be paid in full. To the extent that any excess exists after the payment is applied to the full
payment of one or more Periodic Payments, such excess may be applied to any late charges due.
Voluntary prepayments shall be applied first to any prepayment charges and then as described in the
Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under
the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due
under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due
for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a
lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c)
premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance
premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage
Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow
Items." At origination or at any time during the term of the Loan, Lender may require that Community
Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
F201 : 06/01                                    (Page 4)

Deed Book 32728 Pg 325

1356827

assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
FZ02 : 06/01                          (Page 5)

Deed Book 32728 Pg  326

1356827

subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
FZ03 : 06/01                                    (Page 6)

Deed Book 32728 Pg 327

**1356827**

Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
GA54 : 07/01                               (Page 7)

Deed Book 32728 Pg 328

1356827

rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01

GA55 : 07/01                                   (Page 8)

Deed Book 32728 Pg 329

1356827

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
FZ06 : 06/01                                                   (Page 9)

Deed Book 32728 Pg 338

1356827

interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
FZ07 : 06/01                                    (Page 10)

Deed Book 32728 Pg 331
|IM BIII II IIM IIM II IIM III IIMIBI IM

1356827

to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
FZ28 : 06/01                    (Page 11)



Deed Book 32728 Pg 332
|███ ██ ██ █ ██ ██ ██ ██ █ ██ ██ ██ █ ██ ██ █ █ ██

1356827

the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Deed Book 32728 Pg 333

1356827

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Deed Book 32728 Pg 334

1356827

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law.  Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law.  Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

23. Release.  Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead.  Borrower waives all rights of homestead exemption in the Property.

25. Assumption Not a Novation.  Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

26. Security Deed.  This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 3/01
GA56 : 07/01                              (Page 14)

Deed Book 32728 Pg 335

1356827

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

Unofficial Witness

BORROWERS:

_____ (Seal)
PATRICIA SIBLEY                                         - Borrower

_____ (Seal)
EDWARD KENIMER, JR.                               - Borrower

_____ (Seal)
                                                              - Borrower

_____ (Seal)
                                                              - Borrower

_____ (Seal)
                                                              - Borrower

_____ (Seal)
                                                              - Borrower

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
GA57 ; 07/01                          (Page 15)

Deed Book 32728 Pg   336

1356827

[Space Below This Line For Acknowledgment]

STATE OF Georgia                COUNTY OF Fulton

Signed, sealed and delivered in the presence of:

_____        _____ County
Notary Public,

Fannie Mae/Freddie Mac UNIFORM INSTRUMENT 1/01
GA58 : 07/01                                (Page 16)

Pcs

Deed Book 32728 Pg  337
|[barcode]

## EXHIBIT 'A'

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 214, 17TH DISTRICT, FULTON COUNTY, GEORGIA, BEING LOT 2, BLOCK E, SECTION TWO OF WHITEWATER CREEK COLONY, AS PER PLAT RECORDED IN PLAT BOOK 87, PAGE 70, FULTON COUNTY, GEORGIA RECORDS, WHICH PLAT IS INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

GEORGIA                    LOAN #: 1356827

GRANTOR:   PATRICIA SIBLEY and EDWARD KENIMER, JR.

LENDER:    BROOKHAVEN MORTGAGE, INC.

DATE OF SECURITY DEED:    June 28, 2002

Deed Book 32728 Pg  338
Juanita Hicks
Clerk of Superior Court
Fulton County, Georgia
|■■■■■■■■■■■■■■■■■■■■■■■■■■

## WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREBOF; (2) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED-FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:

Signed, sealed and delivered
in the presence of

_____
Notary Public

_____ (SEAL)
PATRICIA SIBLEY - Grantor

_____ (SEAL)
EDWARD KENIMER, JR. Grantor

_____ (SEAL)
- Grantor

_____ (SEAL)
- Grantor

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of Borrower's Rights" by the Borrowers, I reviewed with and explained to the Borrowers the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrowers of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrowers of Borrower's rights. After said review with and explanation to Borrowers, Borrowers executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review with and explanation to the Borrowers, it is my opinion that Borrowers knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me on the date set forth above.

_____
Notary Public

_____
Closing Attorney

## FORECLOSURE CLOSING DISCLOSURE

· O.C.G.A Section 7-1-1014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.

_____
PATRICIA SIBLEY

_____
EDWARD KENIMER, JR.

Deed Book 32728 Pg  339
Filed and Recorded Jul-11-2002 11:45am
2002-0211513
Juanita Hicks
Clerk of Superior Court
Fulton County, Georgia

**AFTER RECORDING RETURN TO:**
**JACKSON W. JONES, P.C.**
91 W. WIEUCA ROAD
BUILDING A SUITE 4000
ATLANTA GA 30342

RECORD AND RETURN TO:
NATIONAL CITY MORTGAGE CORP.
3232 NEWMARK DRIVE
MIAMISBURG, OHIO 45342

INSTRUMENT PREPARED BY:

PARCEL ID NUMBER:

## ASSIGNMENT OF MORTGAGE OR DEED OF TRUST OR SECURITY DEED
I356827

KNOW ALL MEN BY THESE PRESENTS: THAT WHEREAS
**BROOKHAVEN MORTGAGE**

hereinafter referred to as ASSIGNOR, for and in consideration of the sum of TEN AND NO/100ths
DOLLARS and other good and valuable consideration, receipt of which is hereby confessed and
acknowledged from
**NATIONAL CITY MORTGAGE CORP., 3232 NEWMARK DRIVE, MIAMISBURG, OHIO 45342**

hereinafter referred to as ASSIGNEE, does by these presents grant, bargain, sell, assign, transfer and set
over unto the said ASSIGNEE all right title and interest in and to that certain Mortgage or Deed of Trust or
Security Deed (the "Security Instrument") bearing date of  JUNE 28, 2002
made and executed by
**PATRICIA SIBLEY AND EDWARD KENIMER, JR., JOINT TENANTS**

which said Security Instrument was recorded on                                          as Reception No.
                               in Book No. 32708 at Page 322    in the office of the County Clerk
and Recorder of  FULTON              County, GEORGIA              and which Security
Instrument covers property described as:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.**

PROPERTY ADDRESS: **4402 WHITEWATER CREEK ROAD**
**ATLANTA, GEORGIA 30327**
LOAN AMOUNT: **$950,000.00**
FY12 : 12/01                          Page 1

Deed Book 32728 Pg 340
Juanita Hicks
Clerk of Superior Court
Fulton County, Georgia

1356827

Together with the Note or Notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Security Instrument.

IN WITNESS WHEREOF, said ASSIGNOR has signed these presents this _____ day of

BROOKHAVEN MORTGAGE

BY: _____          BY: _____

ACKNOWLEDGMENT

STATE OF
COUNTY OF

In witness whereof, the

has signed and sealed this                                                    , the day and year
above written.

Signed, sealed and delivered in the presence of:

_____                    _____ (Seal)
Unofficial Witness

_____                    _____ (Seal)
Notary Public

FK53 : 02/02                                    Page 2

CC

Deed Book 49887 Pg 666
Filed and Recorded Mar-07-2011 08:14am
2011-0077062
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

When Recorded, Return to:
Attn: Anthony DeMario/Foreclosure Dept/tst
McCurdy & Candler, L.L.C.
3333 Piedmont Road NE, Six Piedmont Center, Suite 700
Atlanta, GA 30305

STATE OF *Ohio*

COUNTY OF *Montgomery*

File No. 10-18936

## ASSIGNMENT OF SECURITY DEED

FOR VALUE RECEIVED, PNC Bank NA sbm to National City Bank sbm to National City Mortgage Co (hereinafter referred to as "Assignor") hereby sells, assigns, transfers, sets over and conveys without recourse unto Bank of America, N.A. (hereinafter referred to as "Assignee"), whose address is 3232 Newmark Drive Miamisburg, OH 45342, that certain Security Deed or Deed to Secure Debt executed by Edward Kenimer, Jr. and Patricia Sibley to National City Mortgage Co and dated July 22, 2003, recorded in Deed Book 35830, Page 369, Clerk's Office, Superior Court of Fulton County, Georgia, together with the real property therein described; and also the indebtedness described in said Deed and secured thereby, having this day been transferred and assigned to the said Assignee together with all of Assignor's right, title and interest in and to the said Deed, the property therein described and the indebtedness secured; and the said Assignee is hereby subrogated to all the rights, powers, privileges and securities vested in Assignor under and by virtue of the aforesaid Security Deed or Deed to Secure Debt.

Deed Book 49887 Pg 667
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

File No. 10-18936

This Assignment of Security Deed is executed on this 11ᵗʰ day of February, 2011

Signed, sealed and delivered
in the presence of:

PNC Bank NA sbm to National City Bank sbm to
National City Mortage Co

By: _Jessica M. Sannan_     Jessica M. Sannan
Its: _____
             Authorized Signor

_Janet M. Zoller_
Unofficial Witness
Janet M. Zoller

By: _Nicole Sessions / DA Nicole Sessions_
Its: _____
             Authorized Signor

_Annette M. Hope_
Notary Public

My Commission Expires: May 24, 2011

ANNETTE M. HOPE, Notary Public
in and for the State of Ohio
My Commission Expires May 24, 2011

# National City.
## Mortgage Co.
A Subsidiary of National City Bank

**CUSTOMER SERVICE: 1-800-822-5626**
**WWW.NCMC.COM**

---

**Escrow Analysis Statement**

This statement provides a detailed summary of activity related to your escrow account. National City Mortgage Co. maintains your escrow account to pay such items as property taxes, insurance premiums and mortgage insurance.

---

**LOAN NUMBER: 0002503450**
**PREPARED: 12/13/06**
**Page 1 of 1**

PATRICIA SIBLEY
EDWARD KENIMER JR          459/R
4402 WHITEWATER CREEK RD NW
ATLANTA GA   30327

=====================================================================================

## SECTION 1

This section is a comparison of your new and current payment amount of principal and interest, total escrow deposit and repayment of any shortage that may exist.

| NEW MONTHLY MORTGAGE PAYMENT EFFECTIVE 01/01/07 | | CURRENT MONTHLY MORTGAGE PAYMENT |
|---|---|---|
| Principal & Interest (P&I) | $7,275.31 | $7,275.31 |
| Escrow Deposit | $1,751.92 | $1,671.75 |
| Prorated Escrow Shortage | $113.59 | $255.77 |
| **NEW MONTHLY PAYMENT** | **$9,140.82** | **$9,202.83** |

### ANTICIPATED ESCROW PAYMENTS

| ESCROW ITEM | ANNUAL AMOUNT | NEW MONTHLY COLLECTION |
|---|---|---|
| CITY TAX | $11,467.58 | $955.63 |
| HAZARD INS | $5,490.00 | $457.50 |
| COUNTY TAX | $4,065.53 | $338.79 |

**MONTHLY PAYMENT TO ESCROW**                    **$1,751.92**
=====================================================================================

## SECTION 2

This section lists a 12-month running escrow balance to determine the appropriate target balance and to determine if a shortage or surplus exist. This is a projection of the activity in your escrow account for the following 12 months.

| MONTH | DEPOSIT TO ESCROW | DESCRIPTIONS | DISBURSEMENTS FROM ESCROW | PROJECTED ESCROW ACCOUNT BALANCE | REQUIRED ESCROW ACCOUNT BALANCE |
|---|---|---|---|---|---|
| | | | BEGINNING BALANCE | $7,396.57 | $8,759.67 |
| January | $1,751.92 | | | $9,148.49 | $10,511.59 |
| February | $1,751.92 | | | $10,900.41 | $12,263.51 |
| March | $1,751.92 | | | $12,652.33 | $14,015.43 |
| April | $1,751.92 | | | $14,404.25 | $15,767.35 |
| May | $1,751.92 | | | $16,156.17 | $17,519.27 |
| June | $1,751.92 | | | $17,908.09 | $19,271.19 |
| July | $1,751.92 | CITY TAX | $11,467.58 | $8,192.43 | $9,555.53 |
| August | $1,751.92 | HAZARD INS | $5,490.00 | $4,454.35 | $5,817.45 |
| September | $1,751.92 | COUNTY TAX | $4,065.53 | $2,140.74  * | $3,503.84 ** |
| October | $1,751.92 | | | $3,892.66 | $5,255.76 |
| November | $1,751.92 | | | $5,644.58 | $7,007.68 |
| December | $1,751.92 | | | $7,396.50 | $8,759.60 |

**MORE INFORMATION ON REVERSE SIDE**

National City.
Mortgage Co.

A Subsidiary of National City Bank
CUSTOMER SERVICE: 1-800-822-5626
WWW.NCMC.COM

```
┌─────────────────────────────────────────┐
│         Escrow Analysis Statement         │
│ This statement provides a detailed summary of │
│ activity related to your escrow account. National │
│ City Mortgage Co. maintains your escrow   │
│ account to pay such items as property taxes, │
│ insurance premiums and mortgage insurance. │
└─────────────────────────────────────────┘
```

LOAN NUMBER: 0002503450
PREPARED: 11/14/07
Page 1 of 1

PATRICIA SIBLEY
EDWARD KENIMER JR                    71
4402 WHITEWATER CREEK RD NW
ATLANTA GA   30327

==================================================================================================

## SECTION 1

This section is a comparison of your new and current payment amount of principal and interest, total escrow deposit and repayment of any shortage that may exist.

| NEW MONTHLY MORTGAGE PAYMENT EFFECTIVE 01/01/08 | | CURRENT MONTHLY MORTGAGE PAYMENT |
|---|---|---|
| Principal & Interest (P&I) | $7,275.31 | $7,275.31 |
| Escrow Deposit | $1,642.92 | $1,751.92 |
| Prorated Escrow Shortage | $.00 | $113.59 |
| NEW MONTHLY PAYMENT | $8,918.23 | $9,140.82 |

### ANTICIPATED ESCROW PAYMENTS

| ESCROW ITEM | ANNUAL AMOUNT | NEW MONTHLY COLLECTION |
|---|---|---|
| CITY TAX | $11,277.56 | $939.80 |
| HAZARD INS | $4,688.00 | $390.67 |
| COUNTY TAX | $3,749.34 | $312.45 |

MONTHLY PAYMENT TO ESCROW                    $1,642.92

==================================================================================================

## SECTION 2

This section lists a 12-month running escrow balance to determine the appropriate target balance and to determine if a shortage or surplus exist. This is a projection of the activity in your escrow account for the following 12 months.

| MONTH | DEPOSIT TO ESCROW | DESCRIPTIONS | DISBURSEMENTS FROM ESCROW | PROJECTED ESCROW ACCOUNT BALANCE | REQUIRED ESCROW ACCOUNT BALANCE |
|---|---|---|---|---|---|
| | | | BEGINNING BALANCE | $10,067.79 | $8,214.46 |
| January | $1,642.92 | | | $11,710.71 | $9,857.38 |
| February | $1,642.92 | | | $13,353.63 | $11,500.30 |
| March | $1,642.92 | | | $14,996.55 | $13,143.22 |
| April | $1,642.92 | | | $16,639.47 | $14,786.14 |
| May | $1,642.92 | | | $18,282.39 | $16,429.06 |
| June | $1,642.92 | | | $19,925.31 | $18,071.98 |
| July | $1,642.92 | CITY TAX | $11,277.56 | $10,290.67 | $8,437.34 |
| August | $1,642.92 | HAZARD INS | $4,688.00 | $7,245.59 | $5,392.26 |
| September | $1,642.92 | COUNTY TAX | $3,749.34 | $5,139.17 * | $3,285.84 ** |
| October | $1,642.92 | | | $6,782.09 | $4,928.76 |
| November | $1,642.92 | | | $8,425.01 | $6,571.68 |
| December | $1,642.92 | | | $10,067.93 | $8,214.60 |

MORE INFORMATION ON REVERSE SIDE

## 2010 MORTGAGE INTEREST STATEMENT



B6-YM07-01-7
P.O. Box 1820
Dayton, OH 45401-1820



3-749-58501-0004046-001-1-001-000-000-000

PATRICIA SIBLEY
EDWARD KENIMER JR
4402 WHITEWATER CREEK RD NW
ATLANTA GA 30327-3939

 րիկիր||լիկիկիրերորդիրմիրոիստեկիկրիարիկիկիր|

PLEASE REMEMBER TO FILE FOR HOMESTEAD EXEMPTION WITH YOUR TAXING AUTHORITY IF YOU ARE ELIGIBLE.

| SUBSTITUTE FORM 1098 OMB NO. 1545-0901 | * The amount shown may not be fully deductible by you on your Federal Income Tax Return. Limitations based on the cost and value of the secured property may apply. In addition, you may deduct an amount of mortgage interest to the extent it was incurred by you, actually paid by you, and not reimbursed by another person. |
|---|---|
| * The information in boxes 1, 2, and 3 is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if the IRS determines that an underpayment of tax results because you overstated a deduction for the mortgage interest or for these points or because you did not report this refund of interest on your return. | SEE REVERSE SIDE FOR TAXPAYER INSTRUCTIONS |

PROPERTY ADDRESS
4402 NW WHITEWATER CREEK RD
ATLANTA GA 30327

| ACCOUNT NUMBER | TAX IDENTIFICATION NUMBER |
|---|---|
| 00025034500 | ***-**-2773 |

LOAN TYPE
Conventional without PMI

| FEDERAL ID NUMBER | NET INTEREST PAID | POINTS PAID ON PURCHASE OF PRINCIPAL RESIDENCE | REFUND OF OVERPAID INTEREST |
|---|---|---|---|
| 26-2783255 | BOX 1 $13,430.28 | BOX 2 $0.00 | BOX 3 $0.00 |

## DISBURSEMENTS FROM ESCROW ACCOUNT

| PMI/FHA INSURANCE | REAL ESTATE TAXES | HAZARD INSURANCE | ADDITIONAL ASSESSMENTS | OTHER | PRINCIPAL BALANCE |
|---|---|---|---|---|---|
| BOX 4 $0.00 | BOX 5 $15,659.14 | $4,876.00 | $0.00 | $0.00 | $504,757.21 |

In an effort to be eco-friendly and reduce the number of printed pages, the account history is not included on this statement. If you would like to access and view the account history, please log on to our website at www.pnc.com/mortgage 24 hours a day, 7 days a week. Once you have registered, you will immediately have access to your account history as well as other information on your loan.

### INSTRUCTIONS FOR PAYER/BORROWER

A person (including a financial institution, a governmental unit, and a cooperative housing corporation) who is engaged in a trade or business and, in the course of such trade or business, received from you at least $600 of mortgage interest (including certain points) on any one mortgage in the calendar year must furnish this statement to you.

If you received this statement as the payer of record on a mortgage on which there are other borrowers, furnish each of the other borrowers with information about the proper distribution of amounts reported on this form. Each borrower is entitled to deduct only the amount he or she paid and points paid by the seller that represent his or her share of the amount allowable as a deduction. Each borrower may have to include in income a share of any amount reported in box 3.

If your mortgage payments were subsidized by a government agency, you may not be able to deduct the amount of the subsidy. See the instructions for Form 1040, Schedule A, C, or E for how to report the mortgage interest. Also, for more information, see Pub. 936 and Pub. 535.

**Payer's/Borrower's identification number.** For your protection, this form may show only the last four digits of your SSN, ITIN, or ATIN. However, the issuer has reported your complete identification number to the IRS and, where applicable, to state and/or local governments.

**Account number.** May show an account or other unique number the lender has assigned to distinguish your account.

**Box 1.** Shows the mortgage interest received during the year. This amount includes interest on any obligation secured by real property, including a home equity, line of credit, or credit card loan. This amount does not include points, government subsidy payments, or seller payments on a "buy-down" mortgage. Such amounts are deductible by you only in certain circumstances.

**Caution:** If you prepaid interest in 2010 that accrued in full by January 15, 2011, this prepaid interest may be included in box 1. However, you cannot deduct the prepaid amount in 2010 even though it may be included in box 1. If you hold a mortgage credit certificate and can claim the mortgage interest credit, see Form 8396. If the interest was paid on a mortgage, home equity, line of credit, or credit card loan secured by your personal residence, you may be subject to a deduction limitation.

**Box 2.** Not all points are reportable to you. Box 2 shows points you or the seller paid this year for the purchase of your principal residence that are required to be reported to you. Generally, these points are fully deductible in the year paid, but you must subtract seller-paid points from the basis of your residence. Other points not reported in box 2 may also be deductible. See Pub. 936 to figure the amount you can deduct.

**Box 3. Do not deduct this amount.** It is a refund (or credit) for overpayment(s) of interest you made in a prior year or years. If you made itemized deductions in the year(s) you paid the interest, you may have to include part or all of the box 3 amount on the "Other income" line of your 2010 Form 1040. No adjustment to your prior year(s) tax return(s) is necessary. For more information, see Pub. 936 and Itemized Deduction Recoveries in Pub. 525.

**Box 4.** Shows mortgage insurance premiums which may qualify to be treated as deductible mortgage interest. See the Schedule A (Form 1040) instructions.

**Box 5.** The interest recipient may use this box to give you other information, such as the address of the property that secures the debt, real estate taxes, or insurance paid from escrow.

If your home is located in California: Additional accounting may be requested by the mortgagor, trustor, or vendee pursuant to Civil Code 2954. In addition, if you have Private Mortgage Insurance (PMI) on your loan, and if certain conditions are satisfied, you may be able to cancel the PMI coverage. Please contact us for additional information concerning your cancellation rights, if any. This notice satisfies the requirements of California Civil Code Section 2954.6. (Effective July 1, 2003, borrowers may be able to cancel the PMI based upon various factors, including the appreciation of value of the property derived from a current appraisal performed by an appraiser selected by the lender or servicer, and paid for by appreciation of value of the property derived from a current appraisal performed by an appraiser selected by the lender or servicer, and paid for by



# HISTORY OF REAL ESTATE CLOSINGS FOR 4402 WHITEWATER CREEK RD NW
## PNC Mortgage Loan #: 0002503450
6/28/2011

All mortgages handled through Brookhaven Mortgage - Charlie Kontz Was Our Mortgage Broker
After our initial mortgage - everything was handled as a 15 year mortgage
Jackson Jones was the closing attorney for all of our properties after our 1997 original purchase

| Date | Purchase Price | Amount Financed | Mortgage Company | Interest Rate |
|------|---------------|-----------------|------------------|---------------|
| 9/4/1997 | $612,000.00 | $452,000.00 | Dime Mortgage Company New York, NY | 7.7% |
| 3/5/1999 | | $650,000.00 | Accubank Mortgage Corp. Dallas, TX | 6.75% |

Dime Mortgage Paid Off April 12, 1999

| | | | | |
|---|---|---|---|---|
| 6/28/2002 | | $950,000.00 | National City Mortgage Miamisburg, Ohio | 6.75% |

Loan # 0002503450

| | | | | |
|---|---|---|---|---|
| 7/22/2003 | | $920,000.00 | National City Mortgage Miamisburg, Ohio | 5.0% |

Still Loan # 0002503450

PNC Mortgage took over our account in 2008, and we have been with them ever since
Same Loan #.

| Payment Schedule | Amount Paid Monthly | Total Paid Annually |
|------------------|---------------------|----------------------|
| September 1 - December 31, 2003 | $10,000.00 | $40,000.00 |
| January 1 - December 31, 2004 | $10,000.00 | $120,000.00 |
| January 1 - December 31, 2005 | $10,000.00 | $120,000.00 |
| January 1 - December 31, 2006 | $9,200.00 | $110,400.00 |
| January 1 - December 31, 2007 | $9,200.00 | $110,400.00 |
| January 1 - December 31, 2008 | $9,200.00 | $110,400.00 |
| January 1 - December 31, 2009 | $8,925.00 | $107,100.00 |
| January 1 - June 30, 2010 | $9,012.00 | $54,072.00 |
| July 1 - December 31, 2010 | $0.00 | |

**Total Amount Paid to PNC Mortgage September 1, 2003 - June 30, 2010**          **$772,372.00**